UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DOUGLAS JASON WAY,<br><br>Defendant. | No. 1:14-cr-00101-DAD-BAM-1<br><br><br>ORDER DENYING DEFENDANT'S<br>MOTION FOR JUDGMENT OF ACQUITTAL<br>AND MOTION FOR A NEW TRIAL<br><br>(Doc. Nos. 675, 683, 684) |

This matter is before the court on defendant Douglas Jason Way's motion for a judgment of acquittal, or in the alternative, motion for a new trial. (Doc. Nos. 683, 684.)

**BACKGROUND**

Defendant Way was charged in this action by way of a second superseding indictment with conspiracy to manufacture, distribute and/or possess with intent to distribute 5-F-UR-144 and AM-2201 in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 846; manufacture of 5-F-UR-144 and AM-2201 and aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2; distribution of 5-F-UR-144 and AM-2201 and aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2; attempted possession with intent to distribute 5-F-UR-144 and aiding and abetting the same in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 846, and 18 U.S.C. § 2; conspiracy to possess a

listed chemical with reason to know of its wrongful intended use in violation of 21 U.S.C. §§

841(c)(2) and 846; conspiracy to defraud and commit offenses against the United States in

violation of 18 U.S.C. § 371; and introduction into interstate commerce of misbranded drugs and

aiding and abetting the same in violation of 21 U.S.C. §§ 331(a), 333(a)(2), and 18 U.S.C. § 2.

(Doc. No. 196.)  After lengthy pretrial proceedings, the jury trial commenced on June 19, 2018.

On July 13, 2018, the jury returned its verdict, finding defendant guilty on all counts.  (Doc. No.

655.)

On July 20, 2018, defendant filed his motion for a new trial pursuant to Federal Rule of

Criminal Procedure 33(a).  (Doc. No. 675.)  An amended motion for a new trial, as well as a

motion for judgment for acquittal pursuant to Federal Rule of Criminal Procedure 29, were filed

on August 16, 2018.  (Doc. Nos. 683, 684.)  The government filed its oppositions to those

motions on September 7, 2018 and September 15, 2018, respectively.  (Doc. Nos. 698, 699.)

Defendant filed his replies on September 20, 2018 and September 24, 2018.  (Doc. Nos. 701,

704.)  On October 10, 2018, those motions came before the court for hearing.  Assistant United

States Attorney Karen Escobar appeared for the government.  Attorneys Roger Nuttall and W.

Scott Quinlan appeared on behalf of defendant.

Having considered the parties' briefing and the arguments of counsel, and for the reasons

set forth below, defendants' motions will be denied.

**LEGAL STANDARDS**

**A.     Judgment of Acquittal**

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14

days after a guilty verdict or after the court discharges the jury, whichever is later."  Fed. R. Crim.

P. 29(c)(1).  In reviewing a challenge to the sufficiency of the evidence, the court must ask

whether, viewing "the evidence in the light most favorable to the prosecution, any rational trier of

fact could have found the essential elements of the crime beyond a reasonable doubt."  *United*

*States v. Hursh*, 217 F.3d 761, 767 (9th Cir. 2000) (quoting *United States v. Hubbard*, 96 F.3d

1223, 1226 (9th Cir. 1996)); *see also United States v. Garrison*, 888 F.3d 1057, 1063 (9th Cir.

2018).  The Supreme Court has established a two-step inquiry for considering a challenge to a

conviction based on sufficiency of the evidence. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "First, a reviewing court must consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc) (citing *Jackson*, 443 U.S. at 319). "Second, the reviewing court must determine whether this evidence, so viewed, is adequate to allow *any* rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015) (internal ellipses and quotation marks omitted) (quoting *Nevils*, 598 F.3d at 1164). "[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element." *Id.* (internal quotation marks and citations omitted). However, "the government does not need to rebut all reasonable interpretations of the evidence that would establish the defendant's innocence, or 'rule out every hypothesis except that of guilt beyond a reasonable doubt.'" *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326); *see also United States v. Aubrey*, 800 F.3d 1115, 1127 (9th Cir. 2015).

## B.       New Trial

In addition, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A district court's power to grant a motion for new trial is much broader than its power to grant a motion for judgment of acquittal." *United States v. Kellington*, 217 F.3d 1084, 1095 (9th Cir. 2000). In considering a motion for a new trial, "[t]he district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *Kellington*, 217 F.3d at 1095; *see also United States v. Katakis*, 252 F. Supp. 3d 988, 992 (E.D. Cal. 2017). "If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." *Kellington*, 217 F.3d at 1097 (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). Nonetheless, such authority is to */////*

1   be exercised only where extraordinary circumstances are presented. *United States v. Imran*, 964

2   F.2d 1313, 1318 (2d Cir. 1992); *Katakis*, 252 F. Supp. 3d at 992.

3                                           **DISCUSSION**

4          Here, defendant Way has raised multiple arguments in support of his motion for entry of a

5   judgment of acquittal or, in the alternative, a new trial.  The court addresses each in turn.

6   **A.      Motion for Acquittal**

7          1.      Acquittal of Crimes Involving AM-2201

8          Defendant first argues the evidence introduced at his trial, as a matter of law, was

9   insufficient to support a guilty verdict as to any crimes involving the substance known as AM-

10  2201.  Because of this, defendant moves for his acquittal on counts one, two, three, and five of the

11  second superseding indictment.

12         Defendant's request is perplexing.  As the verdict form in this case indicates, the jury did

13  not convict defendant of any conduct related to AM-2201.  (*See* Doc. No. 657.)  The government

14  charged defendant with violations of the Controlled Substances Act as to two separate substances,

15  AM-2201 and 5-F-UR-144.  The verdict form required the jury, if it found defendant guilty of

16  counts one, two, three, or five, to indicate which of the substances it found to be the basis of the

17  offense of conviction.  As to each of those counts, the jury indicated that its finding of guilt was

18  based on 5-F-UR-144, not AM-2201.  Because the jury at his trial did not convict defendant

19  based on any conduct related to the use of AM-2201, his motion for acquittal on this basis is

20  denied.

21         2.      Hallucinogenic Effects of 5-F-UR-144

22         Next, defendant contends there was no testimony admitted at his trial regarding the

23  hallucinogenic effects of 5-F-UR-144.  In this regard, for a substance to qualify as a controlled

24  substance analogue, the substance must have a "stimulant, depressant, or hallucinogenic effect on

25  the central nervous system that is substantially similar to or greater than the stimulant, depressant,

26  or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or

27  II."  21 U.S.C. § 802(32)(A).  The government contended at defendant's trial that 5-F-UR-144 is

28  substantially similar to JWH-018, a controlled substance, both in terms of its chemical structure

                                                4

and its pharmacological effects.  Defendant argues that far from proving any hallucinogenic effect

on the human body, the government's experts who testified at his trial affirmatively disproved

any such hallucinogenic effect.

Defendant focuses on the testimony of Dr. Coop, one of the government's expert

witnesses.  Dr. Coop testified at trial that cannabinoids, such as those at issue in this case, did not

produce pharmacological effects that he would describe as "hallucinogenic." (Doc. No. 569 at

60:21–25.)  He went on to testify that such substances also do not produce "stimulant" effects, but

do produce various psychotomimetic effects, commonly referred to as "getting high." (*Id.* at

61:1–4.)

A second expert witness, Dr. Ghozland, testified for the government in its rebuttal case

regarding the pharmacological effects of 5-F-UR-144.  Defense counsel cross-examined Dr.

Ghozland about Dr. Coop's testimony, asking whether she agreed with his statements regarding

the pharmacological effects of 5-F-UR-144 and JWH-018.  Dr. Ghozland responded that the term

"hallucinogenic" is a legal term used in the Controlled Substances Act, and describes a category

of controlled substances including THC, marijuana, and other cannabinoids. (Doc. No. 644 at

5:17–23.)  Dr. Ghozland went on to explain that academics such as Dr. Coop "don't exactly speak

the same language as people who look at things from a regulatory perspective," which accounted

for the differing usage of the term "hallucinogenic." (*Id.* at 6:9–11.)

The court acknowledges this apparent discrepancy as to the term "hallucinogenic," but

does not find that it supports the granting of defendant's motion for a judgment of acquittal.

There was sufficient evidence introduced at defendant's trial from which the jury could conclude

that JWH-018 and 5-F-UR-144 were substantially similar in their pharmacological effects.  In a

separate portion of her testimony, Dr. Ghozland was again asked about the hallucinogenic nature

of these substances, and explained that although "they're not *classical* hallucinogens [such as

LSD or MDMA], they're definitely hallucinogens." (Doc. No. 666 at 14:20–23 (emphasis

added).)  Moreover, it is clear from Dr. Ghozland's testimony that she was referring not to the

regulatory classification of these substances, but rather to their effects on the body.  When asked

about those effects, Dr. Ghozland testified that both 5-F-UR-144 and JWH-018 produce

1    hallucinations, among many other similar effects.  (*Id.* at 16:1–7.)  Viewed in the light most

2    favorable to the prosecution, there was sufficient evidence for a jury to find that 5-F-UR-144 was

3    substantially similarly to JWH-018 in hallucinogenic effect.

4         In his reply, defendant attempts to recharacterize his argument.  Rather than focusing on

5    the alleged inconsistency of the witness' testimony about the hallucinogenic effects of 5-F-UR-

6    144, defendant now attacks the prosecution's expert testimony on *Daubert* grounds.

7         Both Dr. Coop and Dr. Ghozland stated that their opinions regarding the pharmacological

8    effects of 5-F-UR-144 on humans were based, at least in part, on studies conducted regarding the

9    effects of 5-F-UR-144 and JWH-018 on animals.  (Doc. No. 569 at 47:9–20; Doc. No. 666 at

10   12:4–14.)  In his reply brief, defendant makes sweeping assertions about the reliability of animal

11   studies, contending that "[a]nimal studies are not reliable indicators of the effects a drug will have

12   in humans," because of which "opinions on the effects of a drug on humans may not be based on

13   animal studies."  (Doc. No. 701 at 4–5.)  Defendant cites several cases in support of his broad

14   statements in this regard, but none of them stand for the proposition that the effect of a drug on

15   animals is categorically unreliable in determining the drug's effects on humans.  *See Johnson v.*

16   *Arkema, Inc.*, 685 F.3d 452, 463 (5th Cir. 2012) (noting the "very limited usefulness of animal

17   studies when confronted with questions of toxicity"); *Allen v. Penn. Eng'g Corp.*, 102 F.3d 194,

18   197 (5th Cir. 1996) (stating that "studies of the effects of chemicals on humans must be carefully

19   qualified in order to have explanatory potential for human beings").  In a different context from

20   that presented here, the Ninth Circuit has observed that animal studies "are not per se

21   inadmissible and should be subjected to substantive analysis, just like other scientific evidence."

22   *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 842 (9th Cir. 2001) (citing *Daubert v. Merrell*

23   *Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)).

24        Both Dr. Coop and Dr. Ghozland testified at defendant's trial that animal studies are

25   commonly relied upon in their fields of expertise.  Dr. Coop testified that animal testing is a

26   common practice in the field of pharmacology to determine whether a particular substance is safe

27   for human consumption.  (Doc. No. 569 at 39:10–25, 40:1–3.)  He also testified that the data on

28   which he relied regarding the effects of certain cannabinoids in animals was drawn from scientific

journals that had been subjected to peer review. (*Id.* at 42:3–14.) In the same vein, Dr. Ghozland testified that it is "extremely important" to rely on animal studies in assessing the pharmacological effect of a substance on humans, and that it is a widely recognized practice in the field of behavioral pharmacology. (Doc. No. 666 at 12:4–10.) Finally, several district courts have found that expert testimony based on animal studies is sufficiently reliable in Analogue Act prosecutions to demonstrate a substance's pharmacological effect on the human central nervous system. *See, e.g.*, *United States v. Williams*, No. 13-00236-01, 2017 WL 1856081, at *16 (W.D. Mo. Apr. 7, 2017), *report and recommendation adopted*, 2017 WL 1683068 (W.D. Mo. May 2, 2017); *United States v. Reulet*, No. 14-40005-DDC, 2015 WL 7776876, at *11 (D. Kan. Dec. 2, 2015); *United States v. Bays*, No. 3:13-CR-0357-B, 2014 WL 3764876, at *14 (N.D. Tex. July 31, 2014).

The lone outlier in this line of cases appears to be an unpublished opinion from the District of New Mexico. *See* Order, *United States v. Stockton*, No. 1:13-cr-00571-MCA (D.N.M. May 2, 2016). In that case, the court limited (but did not entirely exclude) the testimony of a government expert witness, Dr. Trecki, whose testimony as to the hallucinogenic effect of a substance was based on a "survey of structure-activity relationship studies, *in vitro* binding and functional assay studies, and *in vivo* tetrad and drug discrimination studies using rodents as subjects, supplemented by anecdotal human case studies." *Id.* at 6. The court in that case concluded that these studies "have not been scientifically validated, singly or in combination, as a reliable method for unqualifiedly determining the hallucinogenic effects of synthetic cannabinoids on the human CNS." *Id.* at 8. Relying on the order issued by the district court in *Stockton*, defendant now contends that the studies relied upon by the government experts in support of their trial testimony were unreliable for the purpose of demonstrating hallucinogenic properties because "[n]one of these studies were designed to test hallucinogenic effects . . . in humans." (Doc. No. 683 at 11.)

In advancing this new argument in his reply, defendant invites this court to craft a *per se* rule that opinions as to the hallucinogenic effects of analogues may never be based on animal studies. Defendant's argument is unpersuasive both because it is not supported by the weight of

7

authority and because its adoption would effectively require the use of human testing in all Analogue Act cases. The Second Circuit very recently rejected defendant's contention on this point. *See United States v. Demott*, ___F.3d___, ___, 2018 WL 4867971, at *4 (2d Cir. Oct. 9, 2018) ("Controlled human testing is not required for an ordinary person to understand the similarity in stimulant, depressant, or hallucinogenic effect . . . of one substance to another."). Moreover, as one district court has observed, "[i]t would be unethical to test the effects of these substances on humans." *United States v. Adams*, No. 14-40005-DDC, 2017 WL 607381, at *5 (D. Kan. Feb. 15, 2017). The undersigned finds the reasoning of these decisions to be compelling. Indeed, some of the testimony the government sought to introduce at defendant's trial regarding the effects of 5-F-UR-144 on humans—such as instances of psychosis and infliction of self-harm—was so extreme that the court precluded it from admission at trial under Rule 403 as likely to improperly inflame the jury's passions.

Even the district court in *Stockton* did not purport to adopt a bright-line rule that animal studies may never provide a reliable basis for determining a substance's pharmacological effects on humans. In finding the methodology of the government's expert in that case to be unreliable, the court in *Stockton* noted that "[t]he scientists who accept Dr. Trecki's methodology are a handful of colleagues at the DEA who, like Dr. Trecki, are captive experts employed by the Government." Order at 8, *Stockton*, No. 1:13-cr-00571-MCA. That concern is absent in this case. Dr. Coop, the government's expert in its case-in-chief, is a professor at the University of Maryland School of Pharmacology, and cannot in any way be fairly described as a "captive expert" of the government. Although Dr. Ghozland is employed by the DEA, her testimony established that the studies she relied on to establish a substance's pharmacological effect in humans are widely relied on in the field of behavioral pharmacology, and specifically are relied on by private pharmaceutical companies to determine whether a substance should eventually be marketed for human consumption. (Doc. No. 666 at 12:4–14.) The court finds that the district court's order in *Stockton*, even if correct in light of the evidence before that court, does not compel a conclusion that the government's expert testimony introduced at defendant Way's trial was based on unreliable principles or scientific methods. Exclusion of the expert testimony

offered by the government at trial because it was based on the results of animal studies with respect to the pharmacological effect of the substances at issue was not warranted, and provides no basis for granting defendant's motion for acquittal.

3.  Vagueness

Finally, defendant moves for judgment of acquittal on the ground that the Analogue Act is unconstitutionally vague as applied to the facts of this case.  Defendant contends that the government's expert witnesses presented competing definitions of the term "substantially similar" in the context of chemical structures, as a result of which the jury was provided no adequate definition to rely upon in evaluating whether the chemical structure of 5-F-UR-144 is substantially similar to JWH-018.

"A criminal statute is void for vagueness if it is not sufficiently clear to provide guidance to citizens concerning how they can avoid violating it and to provide authorities with principles governing enforcement."  *United States v. Harris*, 705 F.3d 929, 932 (9th Cir. 2013); *see also United States v. Chhun*, 744 F.3d 1110, 1116-17 (9th Cir. 2014).  Vagueness challenges come in two forms.  "A statute is unconstitutionally vague on its face if it 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).  By contrast, "[i]n an as-applied challenge, a statute is unconstitutionally vague if it fails to put a defendant on notice his conduct was criminal.  For statutes involving criminal sanctions the requirement for clarity is enhanced."  *United States v. Osinger*, 753 F.3d 939, 946 (9th Cir. 2014).

Here, although styled as an as-applied vagueness challenge, defendant's argument does not implicate the vagueness doctrine.  Vagueness challenges "must be examined in the light of the facts of the case at hand."  *United States v. Mazurie*, 419 U.S. 544, 590 (1975).  Even if defendant is correct that the trial testimony of Dr. Coop and Dr. Willenbring presented inconsistent definitions of "substantial similarity" to defendant's jury, that would have no bearing on whether defendant was put on notice that his conduct was criminal.  In an as-applied vagueness challenge to a criminal statute, the focus is not on whether the jury was presented with a consistent standard

9

at trial, but rather whether the defendant could reasonably have understood the requirements of the law at the time he committed the acts for which he was convicted.[1] *See Demott*, 2018 WL 4867971, at *4 (considering and rejecting an as-applied vagueness challenge to the Analogue Act after finding that defendant was on adequate notice of the pharmacological effect of the substance "at the time of the alleged conspiracy"); *see also Harris*, 705 F.3d at 932 (rejecting an as-applied challenge to a statute prohibiting the carrying of a concealed dangerous weapon on an aircraft because "there were signs in and around the terminal that prohibited all knives"). Defendant's argument that the Analogue Act is unconstitutionally vague as applied to him must be rejected.

Nonetheless, defendant is correct that no fixed standard exists to determine whether a substance qualifies as "substantially similar" to a controlled substance, and is therefore treated as a controlled substance to the extent intended for human consumption. The term is not a scientific one and Congress did not provide a statutory definition in the Analogue Act. Where a statute does not define a term, courts are to look to the word's ordinary meaning. *See In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1181 (9th Cir. 2013); *United States v. TRW Rifle 7.62X51mm Caliber*, 447 F.3d 686, 689 (9th Cir. 2006); *see also United States v. Brown*, 279 F. Supp. 2d 1238, 1240 (S.D. Ala. 2003) ("Since the Analogue Act does not indicate that the term 'substantially similar' is to be defined as it is used scientifically, the court will interpret those words as they are used in everyday language.") Consistent with this precedent, the court in defendant's case instructed the jury that the term "substantially similar . . . has no special meaning other than how it is used in everyday language." *See United States v. Lane*, No. CR-12-01419-DGC, 2013 WL 3199841, at *7 (D. Ariz. June 24, 2013) (finding that "the relevant inquiry for purposes of the Analogue Act is how an ordinary person would interpret" substantial similarity); *United States v. Carlson*, Crim. No. 12-305 (DSD/LIB), 2013 WL 5125434, at *24 (D. Minn. Sept. 12, 2013) ("In other words, the Court looks to the words and determines if someone of

---

[1] For this reason, any suggestion by defendant that the term "hallucinogen" is unconstitutionally vague as applied, based on the trial testimony of Dr. Coop and Dr. Ghozland, is also unavailing. Such an argument is more appropriately categorized as a challenge to the sufficiency of the evidence at trial, a challenge which the court has already addressed and rejected above. The fact that two witnesses may have testified inconsistently at trial, either as to hallucinogenic effect or chemical structure, does not raise a statutory vagueness concern.

common intelligence would be able to understand what conduct has been prohibited."). In addition to the jury instruction given by the court, both government and defense experts provided their own definitions during their testimony as to the term "substantially similar," and were permitted to offer their opinions as to whether 5-F-UR-144 is substantially similar to a controlled substance.

The court does find the Analogue Act to be somewhat perplexing in this regard. On the one hand, both parties agree here that the term "substantially similar" is devoid of scientific meaning, because of which the testimony of chemists and pharmacologists about whether two substances are substantially similar would seem to be of no real help to the jury in making its determination. After all, if the term is not scientific, and is to be understood in accordance with its ordinary meaning, why is a scientist's testimony as to substantial similarity useful to the jury in making that ultimate determination? On the other hand, this case, along with all other Analogue Act prosecutions the court is aware of, effectively boiled down to a "battle of the experts," in which government and defense scientific experts testified in an attempt to persuade the jury that the substance at issue is or is not substantially similar to a controlled substance.

More broadly, this arrangement makes analogue prosecutions quite unlike other drug prosecutions under the Controlled Substances Act, in which a substance is declared to be illegal not because of its peculiar chemical or pharmacological properties, but instead simply because it is scheduled as a controlled substance. Rather, in analogue prosecutions it is left to the trier of fact to determine whether various substances are substantially similar to one another, and are therefore unlawful to the extent intended for human consumption. Here, although the experts were not allowed to opine to the jury on the "ultimate issue" of whether 5-F-UR-144 is unlawful, testimony that a substance is "substantially similar" to a controlled substance in its chemical structure and pharmacological effect is tantamount to a statement that the substance is unlawful under the Analogue Act to the extent it is intended for human consumption. As the undersigned has indicated throughout these proceedings, this arrangement is somewhat puzzling. Nonetheless, the clear weight of authority indicates that the statute is intended to operate in precisely this manner. *See United States v. Gas Pipe, Inc.,* No. 3:14-cr-00298-M, 2018 WL 3641660, at * 3

11

(N.D. Tex. Aug. 1, 2018) ("[T]he challenged [expert] testimony regarding the similarity of controlled substances and the alleged controlled substance analogues is relevant to facts at issue and will be helpful to the jury."); *United States v. Reulet,* No. 14-40005-DDC, 2016 WL 191883, at * 3 (D. Kan. Jan. 14, 2016) ("Naturally, the experts may provide the groundwork to enable the jurors to make their own determination about this question, e.g., the experts may opine about substantial similarity. . .. The jury is equally capable of weighing the expert opinions, deciding if substantial similarity exists under both prongs of the controlling statute, and then concluding whether a drug is a controlled substance analogue under the statute."); *United States v. Lawton*, 84 F. Supp. 3d 331, 337 (D. Vt. 2015) ("[T]he relevant characteristics of the two substances, together with the question of structural similarity, are matters of dispute among the experts. Those disputes may be resolved by a jury."); *United States v. Long*, 15 F. Supp. 3d 936, 942 (D.S.D. 2014) ("A disagreement regarding the degree of similarity between a controlled substance and its alleged analog, as the expert for Long and the Government have, is for the jury to decide."); *United States v. Fedida*, 942 F. Supp. 2d 1270, 1279 (M.D. Fla. 2013) ("A reasonable layperson who examines the two-dimensional drawings of the chemical structures of UR–144, XLR–11, and JWH–18 could plausibly conclude that such substances are substantially similar.").  Indeed, the Second Circuit has recently noted this unusual statutory scheme and recognized that "making criminality depend on the 'substantial similarity' of a substance to an expressly prohibited substance inevitably involves a degree of uncertainty," but nonetheless concluded that such standards "are not so inherently problematic as to independently render a statute void for vagueness."  *Demott*, 2018 WL 4867971, at *3.  Given that the statute has been repeatedly upheld by the courts, including the Supreme Court, in the face of the issues raised by defendant Way, his motion for a judgment of acquittal must be denied.

## B.     Motion for a New Trial

In his motion for a new trial (Doc. No. 683), defendant raises five arguments as to why a new trial should be granted, each of which is addressed below.

/////

/////

1          1.      Hallucinogenic Effects of 5-F-UR-144

2          Defendant first argues that a new trial is warranted because the government presented no

3   testimony at trial that 5-F-UR-144 was hallucinogenic and therefore the jury had no basis upon

4   which to find it to be a controlled substance analogue.  This argument is identical to the argument

5   raised by defendant in his motion for a judgment of acquittal, and is rejected for the same reasons

6   set forth above in addressing that motion.

7          2.      Government's Expert Testimony Regarding Hallucinogenic Effects

8          Defendant next asserts that the government's expert testimony regarding the substantial

9   similarity in hallucinogenic effect of 5-F-UR-144 and JWH-018 was unreliable and should have

10  been excluded under *Daubert*.  This argument has also been addressed and rejected above, since it

11  was raised in defendant's reply in support of his motion for acquittal.  The court finds that Dr.

12  Coop and Dr. Ghozland, the government expert witnesses in the fields of pharmacology, were

13  well qualified to express their opinions on the substantial similarity of 5-F-UR-144 to JWH-018

14  based on their education and experience.  The animal studies on which they in part relied were

15  each published, and therefore subjected to peer review and scientific scrutiny.  (Doc. No. 569 at

16  42:10–14; Doc. No. 644 at 12:19–20.)  The trial testimony of these experts established that the

17  use of animal studies is widely accepted in the scientific community as a reliable indicator of a

18  substance's effects on the human body.  *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)

19  ("[T]he court must assess the reasoning or methodology, using as appropriate such criteria as

20  testability, publication in peer reviewed literature, and general acceptance[.]"), *as amended* (Apr.

21  27, 2010).  Based upon on these factors, the court at trial recognized Dr. Coop and Dr. Ghozland

22  as experts in pharmacology.  (Doc. No. 569 at 17:9–17; Doc. No. 666 at 9:20–23.)  Defendant

23  was permitted to cross-examine both of the government's expert witnesses at length regarding

24  their qualifications and the basis for their conclusions and opinions.  The jury evidently found

25  their testimony to be credible and reliable.  Even had the court concluded that their testimony was

26  of questionable reliability as suggested by the defense, which it does not, the proper remedy for

27  defendant was to attack the experts' testimony by way of vigorous cross examination,

28  presentation of contrary evidence, and drawing the jury's attention to the government's burden of

proof.  *Primiano*, 598 F.3d at 564; *see also Reulet*, 2015 WL 7776876, at *11 ("Defendants'

concerns about [an expert's] reliance on animal studies and preclinical data go to the weight of

the evidence and not admissibility.") (citing *Lawton*, 84 F. Supp. 3d at 339)).

   3. <u>Government's Expert Testimony Regarding Chemical Structure</u>

   Next, defendant asserts that the testimony of the government expert regarding the

chemical structures of 5-F-UR-144 and JWH-018 should have been excluded under *Daubert*.

Defendant argues that the government's expert testimony regarding chemical structures was

insufficiently reliable under *Daubert*.

   "While pretrial *Daubert* hearings are commonly used, they are certainly not required."

*Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014) (en banc) (internal

quotation marks and citations omitted).  Instead, the need for flexibility and a case-by-case

analysis of the proffered testimony has long been recognized.  *See United States v. Alatorre*, 222

F.3d 1098, 1103 (9th Cir. 2000); *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir. 2000)

("[N]ot only must the trial court be given broad discretion to decide *whether* to admit expert

testimony, it 'must have the same kind of latitude in deciding *how* to test an expert's reliability.'")

(quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

   Defendant's motion with respect to this contention is threadbare, and does not even

indicate which expert's trial testimony he takes issue with.  (*See* Doc. No. 683 at 13–14.)

However, the court presumes that the motion refers to Dr. Coop, whom the government offered in

their case-in-chief as an expert in the fields of chemistry and pharmacology.  After his direct

examination, the court found Dr. Coop to be highly qualified on the basis of his education and

experience to testify to the matters at issue in this case, found his testimony to be both relevant

and helpful to the jury, and found his testimony to be reliable.  For this reason, the court

conditionally recognized Dr. Coop as an expert in chemistry and pharmacology, subject to *voir

dire* conducted by defense counsel.  (Doc. No. 569 at 17:9–17.)  Defendant's counsel, however,

did not subsequently challenge Dr. Coop's status as an expert.  Even had they done so, the court

would have denied any such motion since nothing in defense counsel's cross-examination of Dr.

Coop caused the court to reevaluate its view that Dr. Coop's testimony was both relevant to the

issues before the jury at defendant's trial and that his testimony was based on reliable scientific principles and methods.

Defendant's sur-reply directs the court to two Ninth Circuit cases that he contends necessitate the granting of a new trial in this case. (Doc. No. 705.) In *Mukhtar v. California State University, Hayward*, 299 F.3d 1053, 1066 (9th Cir. 2002), *as amended* 319 F.3d 1073 (9th Cir. 2003), the Ninth Circuit remanded a case for a new trial after finding that the district court failed to make an on-the-record reliability determination regarding expert testimony. Similarly, in *Estate of Barabin*, 740 F.3d at 466–67, an en banc panel of the Ninth Circuit held that where evidence is admitted through an erroneous analysis and its admission is prejudicial, but the record is too sparse to conduct a proper admissibility analysis, the proper remedy is to remand for a new trial. *See also United States v. Christian*, 749 F.3d 806, 813 (9th Cir. 2014) (explaining the holding of *Estate of Barabin* and applying it in the context of criminal cases). Neither of these decisions belatedly relied upon by defendant is applicable here because, as stated above, this court made an explicit determination as to the relevance and reliability of Dr. Coop's testimony when it recognized him as an expert. *See* Fed. R. Evid. 702 (a witness may provide expert opinion testimony if, among other things, the witness's testimony "is the product of reliable principles and methods [and] the expert has reliably applied the principles and methods to the facts of the case"). Again, defense counsel was permitted to cross-examine Dr. Coop at length before the jury in an attempt to cast doubt on the reliability of his methods, as has been explicitly approved by the Ninth Circuit. *See Alatorre*, 222 F.3d at 1104 (stating that a district was "well within its discretion" when it permitted the defendant to explore a witness's qualifications and the basis for his testimony at trial and then, following voir dire, renew any objections to the witness's testimony). Following counsel's cross examination there was no challenge raised by the defense to the reliability of Dr. Coop's testimony. Moreover, both of the cases cited in defendant's sur-reply approved of the procedure employed in *Alatorre*. *Estate of Barabin*, 740 F.3d at 463; *Mukhtar*, 299 F.3d at 1066. Dr. Coop was appropriately qualified as an expert at trial. Defendant's contention to the contrary provides no basis upon which to grant his motion for a new trial.

1    4.    Evidence of Compliance with State Law

2        Next, defendant contends that the court erroneously excluded evidence relating to his

3    alleged attempts to comply with state law.  This evidence apparently referred to by defendant

4    consisted of a letter from ZenBio's attorney, Timothy Dandar, regarding the legal status of 5-F-

5    UR-144 both at the federal level and across all fifty states.  The court admitted a redacted form of

6    this letter into evidence when offered by the defense, specifically redacting the portions dealing

7    with 5-F-UR-144's legality under various state laws.  In addition, during trial the prosecution

8    introduced evidence of law enforcement seizures of Zencense and ZenBio products.  Defendant

9    now contends that he was prevented from presenting to the jury that he believed these seizures

10   were conducted pursuant to state rather than federal law.  First, the record does not support this

11   post-trial contention by defendant. Moreover, even if it were supported by the record, he would

12   not be entitled to a new trial on this ground.

13       Defendant offers two arguments as to why evidence of his attempts to comply with state

14   law should have been admitted.  First, relying on the Tenth Circuit's opinion in *United States v.*

15   *Makkar*, 810 F.3d 1139 (10th Cir. 2015), defendant contends that evidence of compliance with

16   state law is relevant to proving that he was attempting to comply with *all* laws, including the

17   federal laws under which he has now been convicted.  As the court has noted in its prior orders,

18   the Supreme Court has laid out a two-pronged approach for proving *mens rea* in prosecutions

19   under the Analogue Act:

20             First, it can be established by evidence that a defendant knew that the
               substance with which he was dealing is some controlled substance—
21             that is, one actually listed on the federal drug schedules or treated as
               such by operation of the Analogue Act—regardless of whether he
22             knew the particular identity of the substance. Second, it can be
               established by evidence that the defendant knew the specific
23             analogue he was dealing with, even if he did not know its legal status
               as an analogue.
24

25   *McFadden v. United States*, 135 S. Ct. 2298, 2305 (2015); *see also Demott*, 2018 WL 4867971, at

26   *7–9.  In other words, the government can prove that defendant knew either that the substance

27   was treated as an analogue, or else that the defendant knew the substance had a chemical structure

28   and pharmacological effect substantially similar to that of a controlled substance.  *See United*

16

1  *States v. Carlson*, 810 F.3d 544, 550 (8th Cir. 2016); *Makkar*, 810 F.3d at 1146; *see also Demott,*
2  2018 WL 4867971, at *14-15 (concurring opinion).

3       In *Makkar*, the government opted to pursue the second method of proof, endeavoring to
4  show that the defendants knew both the chemical and pharmacological properties of the
5  substances they possessed and sold. *Makkar*, 810 F.3d at 1146–47. To rebut this showing,
6  defendants sought to introduce evidence that they had asked state law enforcement agents to test
7  the substance. *Id.* at 1147. The Tenth Circuit reasoned that this evidence was highly relevant,
8  explaining that:

9       As a matter of common sense and our collective experience, we have
10      a hard time imagining more powerful proof that a defendant didn't
        know the chemical composition of a drug, and didn't know it was
        substantially similar to an unlawful substance, than evidence that he
11      turned to law enforcement for information about the drug's
        composition and offered to suspend sales until tests could be
12      performed.

13  *Id.* at 1147–48.

14       Here, by contrast, defendant did not attempt to offer any evidence as proof that he did not
15  know the identity of the substance. Instead, and as defendant's motion for a new trial makes
16  clear, defendant at most sought to elicit evidence to suggest that he was attempting to comply
17  with all relevant legal provisions, including state law. (*See* Doc. No. 683 at 14.) The question is
18  therefore whether evidence of a defendant's attempts to comply with non-federal drug laws can
19  be relevant in demonstrating that the defendant did not know his conduct to be unlawful under the
20  Analogue Act.

21       Although this issue appears to be one of first impression, the court has no difficulty in
22  concluding that evidence of defendant's attempted compliance with state law is irrelevant to a
23  prosecution under the Analogue Act when offered to prove defendant did not know his conduct
24  was unlawful. Defendant was charged with violating federal law, not state law. *McFadden* could
25  not be clearer: the government is required to prove that the defendant knew the substance was
26  "listed on the *federal* drug schedules or treated as such by operation of the *Analogue Act*."
27  *McFadden*, 135 S. Ct. at 2305 (emphases added); *see also United States v. Stanford*, 823 F.3d
28  814, 827 (5th Cir. 2016). In fact, the Supreme Court has specifically rejected the notion that the

government could satisfy its burden simply by proving that "the defendant knew he was dealing with an illegal or regulated substance under *some law*." *McFadden*, 135 S. Ct. at 2306 (emphasis added). Just as defendant's knowledge that he was violating state law would be irrelevant to show that he knew he was violating federal law, the inverse is true as well. Any evidence suggesting that defendant had attempted to comply with state law is not relevant to negate his knowledge that he was violating federal drug laws. In this regard, the court finds instructive cases in which defendants in marijuana prosecutions have attempted to raise as a defense that marijuana possession was legal under state law. In that context, courts have consistently rejected such defenses based upon alleged compliance with state law. *See, e.g.*, *United States v. Kleinman,* 880 F.3d 1020, 1028 (9th Cir. 2017) ("In other words, when a defendant's conviction was entered before § 542 became law, a determination that the charged conduct was wholly compliant with state law would not vacate that conviction."), *cert. denied* __U.S.__, 2018 WL 2418211 (Oct. 1, 2018); *United States v. Gilmore,* 886 F.3d 1288, 1290–1291 (9th Cir. 2018) ("Gilmore and Hemsley argue that they substantially complied with California law, despite their inadvertent presence on federal land. Because § 538 does not apply to offenses committed on federal land, state law defenses are irrelevant."); *United States v. Morales*, 680 Fed. App'x 548, 551 (9th Cir. 2017) (finding that the district court did not err in excluding evidence regarding the legality under state and local law of marijuana cultivation because such evidence was irrelevant);[2] *United States v. Stacy*, 734 F. Supp. 2d 1074, 1084 (S.D. Cal. 2010) ("Defendant's compliance with state law does not grant him immunity under federal law."). Therefore, even if defendant had attempted to introduce any evidence suggesting his efforts to comply with state laws, such evidence would have been irrelevant, and properly excluded on that basis.

Defendant next contends that several of the government's witnesses and exhibits offered at trial were tangentially related to his compliance with state law as a result of which the government opened the door to evidence of his efforts to comply with those state laws. In essence, defendant argues that even if evidence of his compliance with state law was not relevant

---

[2] Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36-3(b).

on its own, it should have been admitted at his trial as a curative admission. *See Nguyen v. Sw. Leasing & Rental Inc.*, 282 F.3d 1061, 1067 (9th Cir. 2002) ("Under the doctrine of curative admissibility, the introduction of inadmissible evidence by one party allows an opponent, in the court's discretion, to introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission.") (internal quotation marks omitted).

Defendant points to two specific categories of evidence that, in his view, opened the door to evidence of his attempts to comply with state law. The first is evidence that defendant's company, variously known as Zencense or ZenBio, relocated from Florida to California. This evidence was offered through the testimony of Robert Biggerstaff, a government witness who had previously been an employee of those companies and had assisted in the relocation to California. At trial, Biggerstaff testified that the company's move from Florida to California was necessitated by 5-F-UR-144 becoming unlawful in Florida. (Doc. No. 581 at 111:15–24.) The natural implication of that testimony was that those involved in the companies, including defendant, were attempting to stay one step ahead of state law, and relocated to California because 5-F-UR-144 had not yet been outlawed there. (*Id.*) Defendant now argues that Biggerstaff's brief testimony on this point opened the door to defendant's offering of additional testimony regarding his attempts to comply with state law.

This argument is unpersuasive because the government did not open this door—defendant did. On direct examination, the government asked no questions regarding why Zencense or ZenBio relocated from Florida, and no reference was made to state laws. It was only on defendant's cross-examination of Biggerstaff where this topic was broached, when defense counsel specifically asked Biggerstaff whether the company relocated to California because 5-F-UR-144 had become illegal in Florida. (*Id.* at 111:6–7.) The government, likely anticipating this line of questioning, objected, contending that issues related to state law were irrelevant. (*Id.* at 111:8.) Rather than the government affirmatively opening the door to issues of state law, this was simply one of many attempts by defense counsel throughout the trial to inject defendant's alleged attempts to comply with, or awareness of, state law into this case. As the court has already stated, such evidence was simply not relevant and was properly excluded.

1   Defendant also asserts that the government opened the door to evidence of his attempted

2   compliance with state law when it introduced evidence at trial that law enforcement had seized

3   Zencense or ZenBio products throughout the country.  To prove that defendant knew his conduct

4   was unlawful under federal law, the government introduced evidence that products sold by

5   defendant's company were seized by law enforcement, that defendant knew of these seizures, and

6   that the company under defendant's direction had implemented a "seizure policy" because of the

7   interdictions.  Defendant contends that admission of this evidence presented a false and

8   misleading narrative to the jury that all of these law enforcement seizures took place pursuant to

9   federal law.

10      Defendant has consistently argued throughout these proceedings that while he was aware

11  that his company's products were being seized by law enforcement, he sincerely believed that the

12  company's business operations were nonetheless fully compliant with the law.  On cross-

13  examination, he admitted to knowing about a seizure that occurred in Fresno in 2012, in which a

14  law enforcement officer seized roughly 12 kilograms of 5-F-UR-144 in a FedEx package

15  addressed to company employee, Natalie Middleton.  (Doc. No. 621 at 163:8–21.)  Evidence was

16  presented at trial in the form of text messages between defendant and Tony Nottoli, indicating

17  that defendant was aware of this law enforcement seizure, and defendant confirmed the

18  authenticity of those texts.  (*Id.* at 162:18–25, 163:1–7.)  Defendant contends, however, that

19  despite knowledge of this seizure, he continued to believe his business operations were entirely

20  lawful.  (*Id.* at 164:13–17.)

21      Once again, however, no door was opened by the admission of this evidence that would

22  necessitate the introduction of evidence relating to defendant's alleged attempts to comply with

23  state law.  Contrary to defendant's suggestion, discussion of these seizures did not "create[ ] a

24  false inference that the seizures were under federal law and that Mr. Way knew that."  (Doc. No.

25  704 at 16.)  Evidence was admitted at trial regarding several seizures of product by both local and

26  federal law enforcement and in each instance the agency the officers were employed by was

27  identified.  The jury at defendant's trial was not misled as to who seized the products or carried

28  out the investigation.  More to the point, defendant was not prevented in any way from fully

rebutting the government's contention that he knew his conduct was illegal under federal law. In addition to his own testimony that he believed his conduct was lawful, defendant was permitted to introduce a redacted legal memorandum from attorney Timothy Dandar. That memorandum was shared with defendant during his employment with Zencense/ZenBio and stated attorney Dandar's opinion that 5-F-UR-144 was legal under federal law. (Doc. No. 621 at 32:8–14.) Defendant testified that he relied on this legal memorandum and, because of its advice, believed that 5-F-UR-144 was legal under federal law. (*Id.* at 33:22–24.) Defendant also offered the testimony of his former colleague, Burton Ritchie. Ritchie had engaged in several discussions with DEA agent Claude Cosey regarding the legality of Ritchie's business. According to Ritchie's testimony, he asked then agent Cosey on numerous occasions whether he was doing anything illegal, to which Cosey responded that he was "not going to interfere with [Ritchie's] business," but that he would notify Ritchie if the laws changed and his business operations became unlawful. (Doc. No. 622 at 63:10–25, 64:1–12.) Ritchie testified that he conveyed this conversation to defendant, arguably providing further support for the defense that defendant Way believed his conduct was legal under federal law.[3] (*Id.* at 64:21–25, 65:1–5.)

In light of this evidence the defense was permitted to introduce at trial, the court finds that defendant was in no way hampered in presenting evidence and arguing to the jury that he believed his conduct was legal under federal law. There was no basis to take a detour into irrelevant issues of compliance with state law. Moreover, issues of state law compliance were never raised by the government and the jury was not misled as to defendant's beliefs about the legality of 5-F-UR-144 under federal law. In short, compliance with state law was not relevant to this action. The jury's guilty verdict on all counts under the Analogue Act indicates that the jury found defendant's evidence to not be credible.

/////

---

[3] This testimony was not offered for its truth but instead as bearing on defendant's state of mind (i.e. that he believed Zencense/ZenBio's business was legal under federal law) because the statement was conveyed to defendant. *See United States v. Pheaster*, 544 F.2d 353, 376 (9th Cir. 1976) ("Under the state of mind exception, hearsay evidence is admissible if it bears on the state of mind of the declarant and if that state of mind is an issue in the case.").

Having evaluated all of the evidence admitted at trial, the court concludes that this verdict did not constitute a "serious miscarriage of justice," and that the granting of defendant's motion for a new trial is therefore not warranted. *Kellington*, 217 F.3d at 1097.

    5.    New Trial as to Counts Six and Seven

Finally, defendant moves for a new trial specifically as to counts six and seven. Defendant was charged in count six with conspiracy to defraud and/or to commit offenses against the United States, and in count seven with introduction into interstate commerce of misbranded drugs and aiding and abetting the same.

As defendant concedes in the motion itself, the defense to both of these counts depended upon the jury crediting defendant's testimony that he did not believe the products were misbranded. (Doc. No. 683 at 24.) However, it is clear the jury rejected defendant's testimony in this regard. Moreover, the court finds that the jury was presented with ample evidence upon which it could reasonably convict defendant on both of these counts. Defendant complains that the exclusion of evidence suggesting his attempt to comply with state law, discussed above, damaged his credibility and made it less likely that the jury would believe his testimony that he fully intended to comply with all labeling laws. For the reasons explained fully above, however, any evidence of alleged attempts to comply with state law were not relevant in this prosecution for violations of federal law.

## CONCLUSION

For all of these reasons, defendant's motions for a new trial and for a judgment of acquittal (Doc. Nos. 675, 683, 684) are denied.

IT IS SO ORDERED.

    Dated:   **October 24, 2018**                    _____
                                                        UNITED STATES DISTRICT JUDGE